UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ALTONIO JUANELL BURTON,<br>Defendant. | No. 2:26-cr-00030-DC-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. No. 13) |

This matter came before the court on July 31, 2026, for a hearing on Defendant Altonio Juanell Burton's motion to suppress the firearm precipitating his indictment, which was discovered during a *Terry*[1] frisk. (Doc. No. 13.) Attorney Douglas Beevers appeared on behalf of Defendant. Attorney Justin Lee appeared on behalf of Plaintiff United States of America. At the hearing, the court took the motion under submission. For the reasons explained below, the court will deny Defendant's motion to suppress.

**BACKGROUND**

On March 5, 2026, the grand jury returned an indictment charging Defendant with a single count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1.) The subject firearm, an 1873 Cattleman 10 mm revolver, was discovered on Defendant's person on

[1] *Terry v. Ohio*, 392 U.S. 1 (1969).

January 18, 2026, when San Joaquin County Sherrif's officers Jesse Pettersson and Javier Ibarra pulled Defendant over for riding his bicycle at night without a headlight. (Doc. Nos. 13 at 1; 18-2.) The officers conducted a *Terry* frisk during the encounter, at which point they discovered the firearm in Defendant's waistband. (*Id.*)

On April 7, 2026, Defendant filed the pending motion to suppress. (Doc. No. 13.) Defendant contends that the officers did not have reasonable suspicion to believe that Defendant was committing or had committed a crime at the time of their encounter, or to suspect that Defendant was armed and dangerous. (*Id.* at 2.)

On May 29, 2026, the Government filed its opposition in which it argues that the officers' stop of Defendant was reasonable because he was riding a bicycle without a front-fixed light in violation of California Vehicle Code § 21201(d)(1), the officers' frisk of Defendant was reasonable because the officers had reason to believe Defendant was armed and dangerous, and that, even if the officers' *Terry* frisk was unlawful, the firearm remains admissible as it would have been inevitably discovered during a routine records check that would have revealed Defendant's active felony arrest warrant. (Doc. No. 16 at 1–2.) On June 4, 2026, Defendant filed a reply. (Doc. No. 17.) On June 10, 2026, the Government filed supplemental materials including a declaration from Officer Pettersson, the San Joaquin County Sheriff's Incident Report, and copies of Officers Pettersson and Ibarra's body worn camera footage on the night of Defendant's arrest. (Doc. Nos. 18–19.)

On June 18, 2026, the court approved the parties' stipulation continuing the hearing on the pending motion to July 31, 2026.

On July 28, 2026, the Government filed a supplemental declaration from Officer Pettersson in support of its opposition. (Doc. No. 23.) On July 29, 2026, Defendant filed a response to that declaration. (Doc. No. 24.)

## LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. A defendant subjected to a warrantless search and seizure that

does not comport with his Fourth Amendment rights may move to suppress the unlawfully obtained evidence at trial. Fed. R. Crim. P. 41(h). Unless an exception applies, any unlawfully obtained evidence cannot be introduced at trial against the person whose Fourth Amendment rights were violated. *USA v. Bohannon*, 506 F. Supp. 3d 907, 912-13 (N.D. Cal. 2020) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

## ANALYSIS

### A. *Terry* Stop

Under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may "initiate a brief stop to investigate potential criminal activity" where the officer has "reasonable suspicion to believe 'criminal activity may be afoot.'" *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) (quoting *Terry*, 392 U.S. at 30). An officer must have "reasonable suspicion 'the person apprehended is committing or has committed a criminal offense.'" *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).

Defendant contends that the officers "had no reason to believe [Defendant] did not have a concealed weapon permit," and thus, did not have probable cause to believe Defendant had committed any crime. (Doc. No. 13 at 2.) Defendant argues that the officers therefore did not have a lawful basis to stop him. (*Id.*) However, Defendant was initially stopped for riding his bicycle at night without a headlight in violation of California Vehicle Code § 21201(d)(1), rather than for possessing a firearm. (Doc. No. 16 at 3.) Defendant does not dispute that he was riding his bicycle at night without a headlight or that the arresting officers observed him doing so.[2] Indeed, the arresting officers were permitted to stop Defendant upon observing that he was operating his bicycle in violation of the California Vehicle Code. *See* Cal. Veh. Code § 21200 ("A person riding a bicycle . . . upon a highway has all the rights and is subject to all the provisions applicable to the driver of a vehicle by this division"); *United States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006) ("An investigatory stop of a vehicle is reasonable under the Fourth Amendment if the officer reasonably suspects that a traffic violation has occurred.").

---

[2] At the hearing on this motion, Defendant conceded that his initial stop under § 21201(d)(1) was lawful.

Thus, the arresting officers had reasonable suspicion that Defendant was violating the law such that their initial stop of Defendant was lawful.

**B. *Terry* Frisk**

Defendant next contends that the arresting officers' search of Defendant's person was unlawful under *Terry* because the "officers had no reason to believe that [Defendant] was armed and dangerous due to the fact that he was riding a bicycle without a headlight." (Doc. No. 13 at 2.)

"Whereas the purpose of a *Terry* stop is to further the interests of crime prevention and detection, a *Terry* frisk is justified by the concern for the safety of the officer and others in proximity." *Thomas*, 818 F.3d at 875–76 (citing *Terry*, 392 U.S. at 22–24). Thus, "a frisk of a person for weapons requires reasonable suspicion that a suspect 'is armed and presently dangerous to the officer or to others.'" *Thomas*, 818 F.3d at 876 (quoting *Terry* at 24). "Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined.'" *Id.* (quoting *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988)).

In Officer Pettersson's police report, he alleges that he searched Defendant "due to him having a large thick hoodie that was covering his waistband area." (Doc. No. 18-2 at 6.) In his supporting declaration, Officer Pettersson confirms that that was the basis for the pat down search. (Doc. No. 23-1 at ¶ 6.) That Defendant was wearing a thick hoody is firmly insufficient to establish a reasonable suspicion that he was armed and dangerous. *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) ("At the suppression hearing, the most [the arresting officer] could point to was that [Defendant] was wearing a 3/4-length lumber jacket, clothing which the State admits could be expected on almost any [person] in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that [Defendant] was armed and dangerous."). Here, as in *Ybarra*, the only basis Officer Pettersson articulated in his police report and supporting declaration for why he believed Defendant to be armed and dangerous was that Defendant wore a thick jacket that covered his waistband on a late winter night. (Doc. Nos. 18-2 at 6; 23-1 at ¶ 6.) By Officer Pettersson's

reasoning, the Constitution permits search of any person wearing a thick jacket on a cold January night. This cannot be so.

In its opposition, the Government expands upon the arresting officers' proffered basis for suspecting Defendant was armed and dangerous. The Government contends that the officers reasonably suspected Defendant was armed and dangerous because he was "riding [his] bicycle in a high-crime neighborhood . . . with no front light, dressed in a manner that suggested concealment and elevated risk: a black face mask[3] and a jacket that covered his waistline." (Doc. No. 16 at 4.) As discussed above, Defendant wearing wintertime attire in wintertime is insufficient to establish a reasonable suspicion that he is armed and dangerous. The Government next cites *Illinois v. Wardlaw*, 528 U.S. 119 (2000), to support their contention that Plaintiff's attire and presence in a "high-crime" neighborhood is sufficient to establish a reasonable suspicion that he is armed and dangerous. The Court in *Wardlaw*, however, held that a suspect's presence in a high drug trafficking area and flea from officers' pursuit was sufficient to establish reasonable suspicion for a *Terry* stop; the Court explicitly did not address whether these factors were sufficient to establish reasonable suspicion that the suspect was armed and dangerous such that a *Terry* frisk was warranted. *Wardlaw*, 528 U.S. at 124 n.2 ("We granted certiorari solely on the question whether the initial stop was supported by reasonable suspicion. Therefore, we express no opinion as to the lawfulness of the frisk independently of the stop."). *Wardlaw* is therefore irrelevant to the propriety of Defendant's *Terry* frisk, which is analyzed independently from his *Terry* stop.

Next, the Government contends that Defendant's "stop presented an objectively heightened safety risk because of [Defendant's] clothing and his non-compliant behavior," specifically, that Defendant was "holding a phone while his other hand remained loose and his waist area—the typical firearm-carry location—remained fully concealed" such that officers "could not see whether [Defendant] had immediate access to a weapon." (Doc. No. 16 at 5.) Thus,

---

[3] While the Government contends that Defendant's face mask evinces concealment, the court notes that at all times during his encounter with Officers Pettersson and Ibarra, Defendant's face mask is pulled below his jaw line such that no portion of his face is concealed.

the Government contends, because "his hands were not reliably secure [the] officers had to take control measures to confirm or dispel their concern that [Defendant] could have a weapon on his person." (*Id*.) The Government appears to argue that where a suspect holds a phone in one hand and nothing in the other, that suspect may be considered a threat to officer safety. To the extent the Government contends that every suspect left unrestrained during a *Terry* stop is a threat to officer safety and therefore subject to a *Terry* frisk, that position is contrary to Ninth Circuit precedent. *See Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020) (stating that handcuffing during a *Terry* stop "'substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop'") (quoting *United States v. Bautista*, 648 F.2d 1286, 1289 (9th Cir. 1982)).

Next, the Government contends that after the "officers stated that a patdown would be conducted to ensure [Defendant] had no weapons and instructed him to interlock his hands above his head," Defendant's demeanor "shifted to an animated, somewhat desperate speech pattern" which "[o]fficers may consider . . . as part of the objective basis for suspecting that a person is armed and dangerous." (Doc. No. 16 at 5) (citing *Wardlaw*, 528 U.S. at 124). Setting aside the Government's proposition that Defendant's demeanor *after* the *Terry* frisk was initiated is relevant to the officer's decision to initiate that frisk—a proposition for which the Government cites no authorities—the court finds it necessary to provide additional context omitted from the Government's brief as to why Defendant's demeanor may have become more "animated" and "somewhat desperate" during the encounter.

Specifically, within forty-five seconds of encountering Defendant, the arresting officers initiate their *Terry* frisk. (Doc. No. 19 at 01:00.) Upon exiting their vehicle, the officers approach Defendant and inform him that the reason they stopped him was because he had no lights on his bike. (*Id.* at 00:30.) Defendant responds, "I was just trying to get home, I live out south." (*Id.* at 00:35.) At this point, Officer Pettersson informs Defendant that he is going to search him for weapons and instructs Defendant to interlock his hands above his head. (*Id.* at 00:40.) Defendant asks whether he's "seriously in trouble" and asks if he can "please call his people." (*Id.* at 00:50.) Defendant then states that he's "cool" and "just want[s] to get home to his baby." (*Id.* at 01:05.)

Officer Pettersson holds Defendant's hands above his head, where they remain throughout the encounter. (*Id.*) At this point, Defendant is in full compliance with the officers' commands. (*Id.*) While Defendant's hands are firmly above his head, Officer Pettersson discovers the firearm in Defendant's waistline and states: "Hey dude, if you fucking reach for that I'll blast your fucking head." (Doc. No. 19 at 01:39–01:43.) Defendant responds "I'm not, what'd I do, please? I'm shaking. Do you see my legs, I'm shaking. I don't want no problems. Oh my God please. I'm cooperating. I'm cooperating." (*Id.* at 01:43–01:56.) Officer Ibarra responds "we will fuck you up if you grab that." (*Id.* at 01:56–01:58.) The officers then place Defendant into handcuffs.

Wearing a thick jacket on a winter night does not render a person a threat to officer safety. Riding a bike through a "high-crime" neighborhood does not render a person a threat to officer safety. Responding in an "animated" and "somewhat desperate" fashion to an officer emphatically threatening to use deadly force does not render a person a threat to officer safety. All three of these factors, considered separately and together, did not give Officers Pettersson and Ibarra reasonable suspicion to believe that Defendant was armed or a threat to their safety; their search of Defendant violated his Fourth Amendment right against unreasonable search and seizure.

**C. Inevitable Discovery**

The Government contends that, even if the court finds the arresting officers' *Terry* frisk of Defendant unlawful—as the court does—the firearm would still be admissible through the inevitable discovery doctrine. (Doc. No. 16 at 9.)

The inevitable discovery doctrine is an exception to the exclusionary rule which "permits the admission of otherwise excluded evidence 'if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police.'" *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). The government must show that the subject evidence would have been inevitably discovered by a preponderance of the evidence. *Id.*

Here, the Government argues that "a routine records search during the traffic stop would have revealed [Defendant's] multiple outstanding warrants, requiring [Defendant's] arrest," and

that the officers would have "searched [Defendant's] person incident to a lawful arrest," and discovered the firearm. (Doc. No. 16 at 9.) Officer Pettersson confirms that "[p]ursuant to standard operating protocol for traffic stops or arrests, a records check was conducted on [Defendant] through the San Joaquin County Records Division," at which point his felony warrants were discovered. (Doc. No. 23-1 at ¶ 15.) Defendant does not dispute that the warrants existed or that he would have been subject to arrest upon their discovery.

As discussed above, a person operating a bicycle on a California road has the same rights and is subject to the same restrictions as a person operating a motor vehicle. Cal. Veh. Code § 21200. Running a record check is an expected part of a traffic stop. *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (stating that a traffic stop is not impermissibly prolonged during routine record check because a record check is an expected part of a traffic stop) (citing *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)). Upon discovery of the warrants, the arresting officers would have been obligated to arrest Defendant. *United States v. Leon*, 467 U.S. 897, 920 n.21 ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.") (internal citation omitted). A search incident to that arrest would have been "undisputedly lawful," at which point the arresting officers would have inevitably discovered the firearm. *Utah v. Strieff*, 579 U.S. 232, 239 (2016).

In his response to Officer Pettersson's declaration, Defendant argues that the declaration is insufficient to establish inevitable discovery because Officer Pettersson "does not mention how long the records check takes for a bicycle infraction," despite Supreme Court precedent requiring that an officer "not extend a traffic stop to demand identification from a passenger where 'knowing [the passenger's] name would not . . . ma[ke] the officers any safer.'" (Doc. No. 24 at 2) (quoting *Rodriguez v. United States*, 575 U.S. 348, 350–54 (2015)). However, in *Rodriguez*, the Court found that the subject traffic stop was unlawfully extended where the officers requested the *passenger's* identification, questioned the *passenger* about his destination, and after the "justification for the traffic stop was 'out of the way,'" directed a drug detecting dog to inspect the vehicle. *Rodriguez*, 575 U.S. at 351–352. Indeed, the Court in *Rodriguez* contrasts that extended encounter with the "ordinary inquiries incident to [a] traffic stop" including "checking

the driver's license, *determining whether there are outstanding warrants against the driver*, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (internal citation omitted and emphasis added). Thus, a standard records check to determine whether Defendant was subject to an outstanding warrant would not have improperly extended the stop and Defendant's reliance on *Rodriguez* is unavailing.

Accordingly, the court finds that the Government has shown, by a preponderance of the evidence, that the arresting officers would have inevitably discovered Defendant's firearm absent their unlawful *Terry* frisk.

**CONCLUSION**

For the reasons explained above, Defendant Altonio Juanell Burton's motion to suppress (Doc. No. 13) is DENIED.

IT IS SO ORDERED.

Dated: **August 2, 2026**

Dena Coggins
United States District Judge